Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Michael Vanunu (MV 4167)
Joanna B. Sobel (JS 0519)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Co.,*
*GEICO Indemnity Co, GEICO General Insurance Company*
*and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and          Docket No.:_____ (      )
GEICO CASUALTY COMPANY,

Plaintiffs,

**Plaintiff Demands a Trial by Jury**

-against-

RELIABLE CPM SURGICAL SUPPLY, INC.,
VADIM SOLOMONOV, OLEG DADASHEV,
LAXMIDHAR DIWAN, M.D. A/K/A LAXMI
DIWAN, FRANCES RISPOLI, D.O., SIDDHARTHA
SHARMA, D.P.M., DAVID CAPIOLA, M.D., and
JOHN DOE DEFENDANTS 1-10

Defendants.

-------------------------------------------------------------------X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.      This action seeks to recover more than $290,000.00 that Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable durable medical equipment ("DME") (e.g. continuous passive motion devices, and water circulating pumps, etc.) through Defendant Reliable CPM Surgical Supply, Inc. ("Reliable CPM").

2.      Reliable CPM is a retailer of DME that rents certain DME products and is owned, operated and controlled by Vadim Solomonov ("Solomonov") and Oleg Dadashev ("Dadashev"). In short, Solomonov and Dadashev devised a scheme in conjunction with various healthcare providers, including Defendants Laxmidhar Diwan, M.D. a/k/a Laxmi Diwan ("Diwan"), Frances Rispoli, D.O. ("Rispoli"), Siddhartha Sharma, D.P.M. ("Sharma"), and David Capiola, M.D. ("Capiola"), either directly or through others who are not readily identifiable to GEICO, to submit large volumes of billing to GEICO and other New York automobile insurance companies for purportedly renting DME (the "Fraudulent Equipment") that was medically unnecessary, illusory, and otherwise not reimbursable.

3.      Based upon prescriptions for Fraudulent Equipment that were issued by various healthcare providers, including Diwan, Rispoli, Sharma, and Capiola (collectively, the "Referral Defendants"), Reliable CPM, Solomonov, and Dadashev (collectively the "Supplier Defendants") allegedly rented the Fraudulent Equipment to individuals who claimed to have been involved in automobile accidents in New York, were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds"), and underwent post-accident surgery.

4.     GEICO seeks to recover more than $290,000.00 that has been wrongfully obtained by the Supplier Defendants and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $660,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Reliable CPM because:

(i)     The Supplier Defendants billed GEICO for purportedly renting the Fraudulent Equipment to Insureds as a result of unlawful financial arrangements between the Supplier Defendants, the Referral Defendants, and other health care providers – either directly or through third-party individuals not presently identifiable;

(ii)    The Supplier Defendants billed GEICO for purportedly renting Fraudulent Equipment that was not medically necessary – to the extent that any Fraudulent Equipment was provided – pursuant to predetermined fraudulent protocols with healthcare providers, including the Referral Defendants – either directly or through third-party individuals not presently identifiable – solely to financially enrich the Supplier Defendants, the Referral Defendants, other healthcare providers, and others not presently known, rather than to treat the Insureds;

(iii)   The Supplier Defendants billed GEICO for purportedly renting Fraudulent Equipment – to the extent that any Fraudulent Equipment was provided – as a result of unlawful prescriptions issued by the Referral Defendants; and

(iv)    To the extent that any Fraudulent Equipment was rented to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Supplier Defendants fraudulently misrepresented that the charges were less than or equal to the maximum permissible reimbursement rate that the Supplier Defendants could have received for the Fraudulent Equipment.

5.     The Defendants fall into the following categories:

(i)     Defendant Reliable CPM is a New York corporation that purports to rent Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and bills New York automobile insurance companies, including GEICO, for renting Fraudulent Equipment.

(ii)    Defendants Solomonov and Dadashev own, operate, and control Reliable CPM and use it to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly rented to automobile accident victims.

(iii)   Defendants Diwan, Rispoli, and Capiola are physicians licensed to practice medicine in New York and New Jersey and issued prescriptions for

Fraudulent Equipment in the names of automobile accident victims who received post-accident surgery, which were provided to and billed by the Supplier Defendants to New York automobile insurance companies, including GEICO.

(iv)     Defendant Sharma is a podiatric physician licensed to practice podiatry in New York and New Jersey and issued prescriptions for Fraudulent Equipment in the names of automobile accident victims who received post-accident surgery, which prescriptions were provided to and billed by the Supplier Defendants to New York automobile insurance companies, including GEICO.

6.       As discussed below, the Defendants always have known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)      The Fraudulent Equipment was rented – to the extent that any equipment was provided – as a result of unlawful financial arrangements between the Supplier Defendants, Referral Defendants, and other health care providers – either directly or through third-party individuals not presently identifiable – and, thus, not eligible for no-fault insurance reimbursement in the first instance;

(ii)     The prescriptions for Fraudulent Equipment were not medically necessary and were provided – to the extent that any DME was provided – pursuant to predetermined fraudulent protocols designed by the Defendants and other healthcare providers – either directly or through third-party individuals not presently identifiable – solely to financially enrich the Defendants, other healthcare providers, and others not presently known, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    The Fraudulent Equipment was rented – to the extent that any Fraudulent Equipment was provided – as a result of decisions made by laypersons, not based upon lawful prescriptions issued by the healthcare providers who are licensed to issue such prescriptions;

(iv)     To the extent that any DME was rented to Insureds, the bills for Fraudulent Equipment submitted by the Supplier Defendants to GEICO – and other New York automobile insurers – fraudulently misrepresented that the charges were less than or equal to the maximum permissible reimbursement rate that Reliable CPM could have received for the equipment.

7.       As such, the Supplier Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through Reliable CPM.

8.      The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to the Reliable CPM's fraudulent scheme.

9.      The Defendants' fraudulent scheme involving Reliable CPM against GEICO and the New York automobile insurance industry began no later than July 30, 2014 and the scheme has continued uninterrupted since that time.

10.      As a result of the Defendants' fraudulent schemes, GEICO has incurred damages of more than $290,000.00.

## THE PARTIES

**I.      Plaintiffs**

11.      Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

**II.      Defendants**

12.      Defendant Reliable CPM is a New York corporation with its principal place of business in Brooklyn, New York. Reliable CPM was incorporated on April 24, 2014, is owned, operated and controlled by Solomonov and Dadashev, and has been used by Solomonov and Dadashev, with the assistance of the Referral Defendants, and others not presently identifiable by GEICO, as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.     Defendant Solomonov resides in and is a citizen of New Jersey.  Solomonov, along with Dadashev, owns and controls Reliable CPM and entered into unlawful financial arrangements with the Referral Defendants and other healthcare providers, either directly or through third-party individuals not presently identifiable, in exchange for referrals to Reliable CPM for the Fraudulent Equipment.

14.     Defendant Dadashev resides in and is a citizen of New York.  Dadashev, along with Solomonov, owns and controls Reliable CPM and entered into unlawful financial arrangements with the Referral Defendants and other healthcare providers, either directly or through third-party individuals not presently identifiable, in exchange for referrals to Reliable CPM for the Fraudulent Equipment.

15.     Defendant Diwan resides in and is a citizen of New York. Diwan became licensed to practice medicine in New York on or about April 8, 1983 and in New Jersey on or about September 1, 1982. Diwan is associated with Englewood Orthopedics Group, PC ("Englewood Ortho") and, on behalf of Englewood Ortho, purportedly performed arthroscopic surgeries on Insureds at a New Jersey ambulatory surgical center. Following the arthroscopic surgeries, Diwan issued prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

16.     Diwan is no stranger to fraudulent schemes.  Diwan was sued by GEICO as part of a scheme similar to the conduct alleged in this Complaint whereby Diwan prescribed post-surgical rehabilitative devices, which were then directed to certain DME providers, in exchange for financial or other consideration.  See Gov't Emples. Ins. Co., et al. v. Genesis Ortho Supply Corp., et al., 1:16-cv-2292 (E.D.N.Y. 2016).

17.     More recently, Diwan was again sued by GEICO as part of a scheme – virtually identical to the conduct alleged in this Complaint – where Diwan purportedly prescribed post-surgical DME that was provided to a DME rental retailer in exchange for unlawful kickbacks. See Gov't Emples. Ins. Co., et al. v. AZcare, Inc., et al., 1:20-cv-05312 (E.D.N.Y. 2020).

18.     Defendant Rispoli resides in and is a resident of New Jersey. Rispoli became licensed to practice medicine in New Jersey on or about February 26, 1996 and in New York on or about February 20, 2014. Rispoli is also associated with Englewood Ortho and, on behalf of Englewood Ortho, purportedly performed arthroscopic surgeries on Insureds at a New Jersey ambulatory surgical center. Following the arthroscopic surgeries, Rispoli issued prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

19.     Defendant Capiola resides in and is a resident of New York. Capiola became licensed to practice medicine in New York on or about July 6, 2007 and in New Jersey on or about September 9, 2010. Capiola is associated with McCulloch Orthopaedic Surgical Services, PLLC d/b/a New York Sports & Joints Orthopaedic Specialists ("NY Sports & Joints") and, on behalf of NY Sports & Joints, purportedly performed arthroscopic surgeries on Insureds at either a New York or New Jersey ambulatory surgery center. Following the arthroscopic surgeries, Capiola issued prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

20.     Defendant Sharma resides in and is a resident of New York. Sharma became licensed to practice podiatry in New York on or about May 1, 2008. Sharma is associated with NY Sports & Joints and, on behalf of NY Sports & Joints, purportedly performed arthroscopic surgeries on Insureds at a New Jersey ambulatory surgery center. Following the arthroscopic

surgeries, Sharma issued prescriptions for Fraudulent Equipment that were provided to the Supplier Defendants and are part of the fraudulent claims identified in Exhibit "1".

**III.**    **Other Pertinent Individuals**

21.    Although not named as Defendants in this Complaint, Gregory Mickilwski a/k/a Greg Miller ("Miller") and AZCare Rent, Corp. ("AZ Rent") are relevant to understanding the claims in this action.

22.    Miller is not and has never been never been a licensed healthcare provider. Miller engaged in criminal and fraudulent conduct through his secret ownership, control and operation of multiple DME retailers that either provided or rented DME to motor vehicle accident victims insured by GEICO and other New York automobile insurers.

23.    Miller originally entered the DME business by operating a DME retailer called Daily Medical Equipment Distribution Center, Inc., and obtained prescriptions from healthcare providers primarily treating individuals injured in automobile accidents and covered by No-Fault because of the lack of regulatory oversight in the no-fault system.

24.    As part of obtaining prescriptions from No-Fault insurance healthcare providers, Miller entered into an agreement with the healthcare providers to pay them $125.00 for each DME prescription that his company received.

25.    In 2014, after Daily Medical Equipment Distribution Center, Inc. was investigated by the Internal Revenue Service, Miller continued his fraudulent operations through additional entities where he was not the owner of record.

26.    Miller used other individuals who would be designated – on paper – as the sole owner of each corporate entity, but in reality would still be owned, operated, and controlled by Miller.

27.     In 2018, Miller convinced Alena Zakharova ("Zakharova") to open up two DME retailers, including AZ Rent, where Zakharova would be the sole owner on paper but Miller would be the actual owner, controller and operator of AZ Rent.

28.     Although Miller owned and operated multiple DME retailers, his business model for each retailer – including AZ Rent – was the same; Miller payed kickbacks in exchange for DME prescriptions and submitted bills to insurance companies that fraudulently inflated charges.

29.     On February 18, 2020, Miller was arrested, charged, and arraigned on one count of Conspiracy to Commit Health Care Fraud under 18 U.S.C. § 1347.

30.     The criminal charges in the information against Miller included the following:

(i)     Between October 2014 and December 2019, Miller conspired with and employed other individuals to serve as nominal owners of DME retailers in Brooklyn, New York, when Miller was the true owner and operator of these facilities.

(ii)    At the direction of Miller, the DME retailers that Miller secretly owned submitted bills to No-Fault insurance carriers that were fraudulent because, among other things: (i) the DME was never provided to patients; (ii) the DME was medically unnecessary; and (iii) the bills represented that the DME provided to the Insureds were expensive when the DME provided was actually inexpensive.

(iii)   Between October 2014 and December 2019, the DME retailers that Miller secretly owned billed no-fault insurance companies over $9 million and was paid over $3.6 million for the fraudulent bills.

See United States v. Miller, S.D.N.Y., 1:20-cr-00134-KPF, Docket No. 2.

31.     Miller pled guilty during his arraignment to one count of Conspiracy to Commit Health Care Fraud.

32.     More details regarding Miller's fraudulent scheme was disclosed as part of the sentencing memorandums submitted to the Court on behalf Miller and the Government. The following facts were provided to the Court for its consideration in determining Miller's sentence:

(i)      From 2012 to 2019 the Miller operated a series of DME retailers that fraudulently billed No-Fault insurers for expensive DME that was not provided to patients.

(ii)     Due to an IRS investigation into Miller, Miller paid other individuals to serve as nominal owners of the DME retailers when Miller was the *de facto* owner of each company. Miller directed each individual to falsely represent to banks, insurance companies, and others that they were the owners of the DME retailers when Miller was the true owner.

(iii)    As part of the operation for the DME retailers, Miller paid kickbacks to corrupt healthcare professionals in exchange for DME prescriptions, at a rate of $125.00 per prescription.

(iv)     AZ Rent was a company that Miller secretly owned, which rented machines to Insureds. Miller paid kickbacks to medical providers who provided prescriptions to AZ Rent.

See United States v. Miller, S.D.N.Y., 1:20-cr-00134-KPF, Docket Nos. 19-20, passim.

33.     On September 11, 2020, Miller was sentenced to 24 months incarceration, three years of supervised released, and restitution to insurance companies in the amount of $3,698,010.00.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

35.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

36.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

37.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

38.     GEICO underwrites automobile insurance in the State of New York.

**I.     An Overview of the Pertinent Laws**

**A.     Pertinent Laws Governing No-Fault Insurance Reimbursement**

39.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

40.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

41.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

42.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

43.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

44.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

45.     New York law prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. <u>See</u>, <u>e.g.</u>, N.Y. Educ. Law §§ 6509(10), 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

46.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". <u>See</u> N.Y. Educ. Law §§ 6509(10), 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

47.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

48.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as

"Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

49.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

50.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

51.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME**

52.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

53.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

54.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York Fee Schedule.

55.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

56.     As it relates to charges for renting DME, the New York Fee Schedule sets forth the maximum charges as follows:

> the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule.

See 12 N.Y.C.R.R. § 442.2(b).

57.     As indicated by the New York Fee Schedule, payment for DME is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

58.     For Fee-Schedule items, Noridian Healthcare Solutions, LLC ("Noridian"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

59.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Noridian. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Noridian.

60.     As indicated by the New York Fee Schedule, the total monthly rental cost for Fee-Schedule items shall not exceed the lower of: (i) the monthly rental charge to the general public; or (ii) the monthly fee permitted under the Medicaid Fee Schedule.

61.     Under the Medicaid Fee Schedule, the total monthly rental charges for equipment, supplies, and services of Fee Schedule items is 10% of the maximum reimbursement amount.

62.     However, when DME is rented and charged to automobile insurers using HCPCS codes that are recognized by the Medicaid Fee Schedule but do not contain a maximum reimbursement amount the maximum charge for a monthly rental is 10% of the acquisition cost for the DME. See New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines, p. 16; Gov't Emples. Ins. Co. v. MII Supply LLC, Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019) (applying the 10% of acquisition cost rule for DME rentals within the New York State Medicaid Program Durable Medical Equipment Manual

Policy Guidelines to No-Fault reimbursement for HCPCS Codes that are recognized by the Medicaid Fee Schedule but do not contain a reimbursement amount).

63.     For charges related to rental cost of Non-Fee Schedule items, the maximum monthly rental cost, as per the New York Fee Schedule, is the monthly cost to the general public because the New York State Department of Health has not established a price for DME rentals and defers as a matter of policy to the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines.

64.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for rental DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)     The provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(ii)    The prescription for DME is not based any unlawful financial arrangement;

(iii)   The DME identified in the bill was actually provided to the patient based upon a legitimate prescription; and

(iv)    The monthly rental fee sought for renting DME to an Insured was not in excess of: (a) 10% of the maximum reimbursement rate for Fee Schedule items; (b) 10% of the acquisition cost for Fee Schedule items without a listed maximum reimbursement rate; or (c) the price to the public for Non-Fee Schedule items.

## II.     The Defendants' Fraudulent Schemes

65.     Beginning in or about July 2014 the Defendants masterminded and implemented a complex fraudulent scheme in which Reliable CPM was used as a vehicle to bill GEICO and other New York automobile insurers for more than $1,800,000.00 in No-Fault Benefits that they were never entitled to receive.

66.     To date, the Supplier Defendants have wrongfully obtained more than $290,000.00 voluntarily from GEICO and there is more than $660,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Supplier Defendants continue to seek payment of from GEICO.

**A.     Overview of the Defendants' Fraudulent Scheme**

67.     Solomonov and Dadashev used Reliable CPM to maximize the amount of No-Fault Benefits they could obtain by submitting fraudulent bills to GEICO and other New York automobile insurers seeking reimbursement for the Fraudulent Equipment.

68.     In order to implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits they could obtain from GEICO and other New York automobile insurers, the Supplier Defendants entered into illegal financial agreements with the Referral Defendants and other healthcare providers, either directly or through third-parties who are not presently identifiable, in order to obtain prescriptions for the Fraudulent Equipment.

69.     Pursuant to those agreements, the Referral Defendants and other healthcare providers would regularly and intentionally provide fraudulent prescriptions, including unlawfully duplicated prescriptions, for medically unnecessary Fraudulent Equipment to the Supplier Defendants in the names of Insureds.

70.     The Referral Defendants and other healthcare providers would typically prescribe the medically unnecessary Fraudulent Equipment after they performed a minimally-invasive arthroscopic procedure on the Insureds.

71.     Virtually every Insured who was issued a prescription for Fraudulent Equipment that was provided by the Referral Defendants and other healthcare providers to the Supplier Defendants was prescribed identical DME consisting of continuous passive motion devices ("CPMs"), and cryotherapy units ("CTUs") without regard to the Insureds' post-surgical presentations.

72.     Once the Supplier Defendants received the prescriptions from the Referral Defendants and other healthcare providers, the Supplier Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for Fraudulent Equipment that was provided to the Insureds.

73.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment, the Supplier Defendants represented that the Fraudulent Equipment they dispensed to Insureds was determined to be medically necessary by a healthcare provider licensed to prescribe DME.

74.     However, the charges identified in Exhibit "1" were not for medically necessary medical equipment. To the contrary, the DME dispensed by the Supplier Defendants and contained in Exhibit "1" was rented to Insureds pursuant to a predetermined fraudulent protocol that was the result of an illegal financial arrangement.

75.     In keeping with the fact that the Fraudulent Equipment was prescribed pursuant to a predetermined fraudulent protocol, the length of the rentals to Insureds for the Fraudulent Equipment virtually always exceeded medical utility and did not comport with generally accepted medical guidelines.

76.     For example, the Fraudulent Equipment was rented to Insureds for weeks at a time after the Insureds underwent basic arthroscopic procedures when the post-operative care for which virtually always consisted of minimal amounts of rehabilitation.

77.     Further, in many of the charges identified in Exhibit "1", the Supplier Defendants purportedly rented the Fraudulent Equipment to Insureds as a result of unlawfully photocopied prescriptions issued by healthcare providers, including Diwan and Rispoli.

78.     In keeping with the fact that the prescriptions for Fraudulent Equipment were unlawfully photocopied, prescriptions issued by Diwan and Rispoli to multiple Insureds had an identical signature and unique prescription identification number.

79.     In other instances the Supplier Defendants billed GEICO for Fraudulent Equipment purportedly rented to the Insureds based upon prescriptions containing a stamp or photocopied signature or initials on a pre-printed form.

80.     The Supplier Defendants then submitted billing to GEICO that fraudulently misrepresented that the Supplier Defendants were seeking reimbursement for the Fraudulent Equipment at a cost that less than or equal to the applicable standard for renting the Fraudulent Equipment, i.e. the monthly cost to the general public for renting the same item.

81.     In reality, the bills submitted by the Supplier Defendants to GEICO, and likely other automobile insurers, for renting the Fraudulent Equipment were at rates grossly in excess of the permissible reimbursement rate.

82.     Furthermore, the bills submitted by the Supplier Defendants to GEICO fraudulently misrepresented that the Supplier Defendants were entitled to collect delivery and set up charges related to the Fraudulent Equipment when delivery and set up charges were not reimbursable under No-Fault Benefits.

83.    The Supplier Defendants were able to perpetrate this scheme due to secret unlawful financial agreements with the Referral Defendants and other healthcare providers, either directly or through third-party individuals who are not presently identifiable.

84.    Upon information and belief, as part of the unlawful financial arrangement scheme between the Supplier Defendants and healthcare providers, including the Referral Defendants, either directly or through third-party individuals who are not presently identifiable, the Supplier Defendants typically received the prescriptions for Fraudulent Equipment directly from the healthcare providers without going through the Insureds.

85.    By providing medically unnecessary and unlawful prescriptions to the Supplier Defendants, the Referral Defendants and other healthcare providers intentionally enabled the Supplier Defendants to bill GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was dispensed pursuant to invalid and unlawful prescriptions; (iii) Fraudulent Equipment at grossly inflated reimbursement rates; and (iv) Fraudulent Equipment that was otherwise not reimbursable.

### B.    The Defendants' Illegal Financial Arrangements

86.    Upon information and belief, to execute their fraudulent scheme the Supplier Defendants entered into unlawful financial arrangements with the Referral Defendants and other healthcare providers, either directly or through third parties who are not presently identifiable, in order to obtain access to Insureds and maximize the amount of No-Fault Benefits the Supplier Defendants could obtain from GEICO and other New York automobile insurers.

66.    Upon information and belief, the Supplier Defendants paid illegal kickbacks to the Referral Defendants and other healthcare providers – either directly or through third parties who are not presently identifiable – in order to obtain prescriptions for the Fraudulent Equipment.

These schemes allowed the Supplier Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

87.     As part of this unlawful financial arrangement, upon information and belief, the Referral Defendants and other healthcare providers systematically prescribed the Fraudulent Equipment to Insureds after they received minor arthroscopic surgeries.

88.     In keeping with the fact that the prescriptions for Fraudulent Equipment were issued pursuant to unlawful financial arrangements, as set forth in more detail below, the prescriptions for Fraudulent Equipment were issued as a result of a predetermined fraudulent treatment protocol, not due to the medical necessity for each Insured.

89.     For example, virtually every Insured identified in Exhibit "1" that treated with the Referral Defendants received a virtually identical prescription for a CTU and a CPM after undergoing a minimally invasive arthroscopic procedure that required, at most, minimal amounts of post-surgical rehabilitation.

90.     The Supplier Defendants then submitted thousands of claims for renting the Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

91.     In keeping with the fact that the Supplier Defendants obtained prescriptions as a result of unlawful financial arrangements, the Supplier Defendants drastically increased the volume of their billing to GEICO and other New York automobile insurers for Fraudulent Equipment.

67.     By way of example, in 2015 and 2016, upon information and belief, before the Supplier Defendants fully exploited their unlawful financial arrangement scheme, the Supplier Defendants submitted charges to GEICO that totaled under $150,000.00 for renting the Fraudulent Equipment per year. By contrast, in 2017, the Supplier Defendants submitted charges

to GEICO that totaled more than $375,000.00 for renting the same exact Fraudulent Equipment. Moreover, the total dollar amount billed by the Supplier Defendants increased in 2018 and 2019 as the Supplier Defendants submitted charges totaling more than $460,000.00 in 2018 and more than $550,000.00 in 2019 for renting the same exact Fraudulent Equipment. As GEICO is only one of many automobile insurers in New York, these examples provide only a fraction of the amount of fraudulent charges submitted by the Supplier Defendants to the New York insurance industry.

92.     Upon information and belief, pursuant to the unlawful financial arrangements, the Supplier Defendants would pay kickbacks either to the Referral Defendants directly or to other entities, such as a fictitious business, a real estate company or a transportation company, in order to obtain referrals for Fraudulent Equipment from the Referral Defendants.

93.     In support of the fact that there were unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants – either directly or through unidentified third-parties – the Supplier Defendants paid almost $50,000 to Starmed Group Inc. ("Starmed") between 2018 and 2019 for no legitimate purpose.

94.     For example, Reliable CPM issued the following checks to Starmed:

(i)      Check #0412 issued on July 9, 2018 in the amount of $5,100.00, with the word "services" in the memo section;

(ii)     Check #0388 issued on August 5, 2018 in the amount of $4,910.00;

(iii)    Check #0403 issued on September 5, 2018 in the amount of $4,950.00;

(iv)    Check #0412 issued on October 12, 2018 in the amount of $3,000.00;

(v)     Check #0468 issued on January 8, 2019 in the amount of $6,600.00, with the word "services" in the memo section;

(vi)    Check #0418 issued on January 30, 2019 in the amount of $5,508.05;

(vii)   Check #0431 issued on March 6, 2019 in the amount of $4,932.00;

       (viii)    Check #0481 issued on March 22, 2019 in the amount of $2,321.29;

       (ix)    Check #0480 issued on April 1, 2019 in the amount of $5,024.25;

       (x)    Check #0442 issued on May 6, 2019 in the amount of $2,676.88, with the word "services" in the memo section;

       (xi)    Check #0452 issued on June 2, 2019 in the amount of $4,088.20, with the word "services" in the memo section;

68.    Upon information and belief, the above-mentioned payments by Reliable CPM were issued solely in support of the unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants, in order to obtain prescriptions for Fraudulent Equipment.

95.    Starmed is a company owned by Walter Gromshkov ("Gromshkov") and is the primary leaseholder for office space that is used by healthcare professionals to run multi-disciplinary medical offices that see a high volume of No-Fault insurance patients. In essence, Starmed is nothing more than a landlord that leases medical office space.

96.    Gromshkov and Starmed have been the subject of lawsuits brought by GEICO as Gromshkov uses Starmed and other entities to secretly and unlawfully own, control and derive economic benefit from healthcare providers in contravention of New York law. See Gov't Emples. Ins. Co.  v. Healthy Age Medical, P.C. et al., 1:19-cv-02398 (E.D.N.Y. 2019); Gov't Emples. Ins. Co. v. Trinity Medicine, P.C. et al., 1:20-cv-03080 (E.D.N.Y. 2020).

97.    In keeping with the fact that the above-referenced payments by Reliable CPM to Starmed – a purported lessor of medical office space – were part of an unlawful financial arrangement to obtain prescriptions for Fraudulent Equipment: (i) upon information and belief, the Supplier Defendants did not rent office space from Starmed; (ii) the payments were for inconsistent amounts; (iii) the payments were not consistently provided with the number of

payments varying each month; and (iv) some of the checks indicated that the payments were for "services".

98.     In addition to Starmed obtaining payments from Reliable CPM, Starmed also received payments from Englewood Ortho for purportedly leasing space. By contrast to Reliable CPMs payments, Englewood Ortho paid Starmed $2,000 per month.

69.     Upon information and belief, the above-mentioned payments by Reliable CPM to Starmed are only a fraction of the monies paid by Reliable CPM in support of the unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants, in order to obtain prescriptions for Fraudulent Equipment.

99.     In further keeping with the fact that the Supplier Defendants entered into unlawful financial arrangements with healthcare providers, including the Referral Defendants – either directly or through third-parties who are presently unidentifiable – in exchange for prescriptions for Fraudulent Equipment, the healthcare providers also received kickbacks from other DME retailers for providing DME prescriptions.

100.    For example, as indicated above, Miller pled guilty to health care fraud, which involved payment of kickbacks, at a rate of $125.00 per prescription, to healthcare providers in exchange for prescriptions for DME.

101.    Miller's conviction stemmed – in part – from illegal kickback payments he made on behalf of DME retailers that he secretly owned, including AZ Rent.

102.    As set forth in Miller's sentencing memorandum, Miller paid kickbacks to healthcare providers in exchange for referrals for DME to AZ Rent. See United States v. Miller, S.D.N.Y., 1:20-cr-00134-KPF.

103.   Diwan was the main healthcare provider that issued prescriptions to Insureds that was provided to AZ Rent in exchange for payments from Miller.

104.   The prescriptions that Diwan issued to AZ Rent – in exchange for payments from Miller – were identical to the prescriptions, as detailed below, that Diwan issued to Reliable CPM.

105.   As a result of the unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants – either directly or through third-parties who are presently unidentifiable – the Supplier Defendants were able to bill GEICO for filling prescriptions that were: (i) not medically necessary: (ii) issued as part of a predetermined fraudulent protocol; and (iii) not lawfully issued.

106.   Upon information and belief, the Referral Defendants knowingly participated in the Supplier Defendants unlawful financial arrangement schemes – either directly or through third-parties who are presently unidentifiable – by issuing prescriptions for medically unnecessary Fraudulent Equipment that they knew were submitted to and billed by the Supplier Defendants as part of a scheme to defraud GEICO and other New York automobile insurers.

107.   In further support that the Referral Defendants knowingly participated in the Supplier Defendants unlawful financial arrangement schemes, the Referral Defendants either: (i) knowingly provided unlawfully duplicated prescriptions that they knew were submitted to and billed by the Supplier Defendants to insurers; or (ii) permitted others to duplicate or affix their signature or initials on prescriptions for Fraudulent Equipment that they knew were submitted to and billed by the Supplier Defendants to insurers.

108.   In all of the claims identified in Exhibits "1" the Supplier Defendants falsely represented that the Fraudulent Equipment was provided pursuant to lawful prescriptions from

healthcare providers, and were therefore eligible to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were provided pursuant to unlawful financial arrangements and were thus non-reimbursable.

**C. The Supplier Defendants' Fraudulent Prescription-Issuing Protocol**

109.     In addition to the unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants, the prescriptions provided to the Supplier Defendants were issued pursuant to predetermined fraudulent protocols that were designed to maximize the billing that the Supplier Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

110.     In the claims identified in Exhibit "1", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

111.     Concomitantly, almost none of the Insureds identified in Exhibit "1", whom the Referral Defendants and other healthcare providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

112.     In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

113.     To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an

outpatient basis, and then sent on their way with a diagnosis no more serious than a minor soft tissue injury such as a sprain or strain.

114.    However, despite virtually all of the Insureds identified in Exhibit "1" were involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds were subject to extremely similar treatment including prescriptions for the Fraudulent Equipment.

115.    The Referral Defendants and other healthcare providers issued prescriptions for Fraudulent Equipment to the Insureds identified in Exhibit "1" pursuant to predetermined fraudulent protocols without regard for the Insureds individual presentation.

116.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit the fraudulent protocols described below to proceed under his, her, or its auspices.

117.    Healthcare providers, including the Referral Defendants, permitted the predetermined fraudulent protocols described below, which were not medically necessary, to proceed under their auspices because they and the Supplier Defendants sought to profit from the fraudulent billing submitted to GEICO and other New York automobile insurers.

118.    The predetermined fraudulent treatment protocols executed by the Referral Defendants and other healthcare providers that purportedly treated Insureds followed a similar pattern for an overwhelming majority of the Insureds associated with the claims identified in Exhibit "1", and was typically as follows:

- the Insured would arrive at a multi-disciplinary medical office that saw a high-volume of No-Fault patients for treatment subsequent to a motor vehicle accident;

- the Insured would be seen either by a physician, chiropractor, acupuncturist, physician's assistant, or nurse practitioner, and subsequently undergo multiple therapies, including chiropractic and physical therapy;

- thereafter, the Insured would be referred to an orthopedic surgeon for complaints regarding one or more of the Insureds' extremities, such as a shoulder, knee, or ankle;

- the orthopedic surgeon would then perform a relatively minor surgical procedure on one or more of the Insured's extremities, such as an arthroscopic procedure;

- as a result of the surgery, the orthopedic surgeon would provide one or more prescriptions for a CTU and CPM, which would be directly provided to the Supplier Defendants to fill and was without any involvement by the Insured.

119. Virtually all of the claims identified in Exhibit "1" are based upon medically unnecessary prescriptions for identical Fraudulent Equipment that were provided to the Supplier Defendants after arthroscopic procedures

120. In a legitimate setting, when a patient undergoes a minimally invasive surgery, the surgeon would evaluate the patient's individual circumstances to determine a specific course of post-surgical rehabilitation.

121. Furthermore, in a legitimate setting, in determining a specific course of post-surgical rehabilitation, a surgeon may – but not always – prescribe DME that should aid in the patient's surgical recovery.

122. In determining whether to prescribe DME as part of a patient's surgical recovery – in a legitimate setting – a healthcare provider would evaluate multiple factors, including: (i) whether the patient is capable of performing at-home rehabilitative treatment; (ii) whether the patient is capable of undergoing physical therapy; (iii) whether the DME is likely to help improve the patient's surgical recovery; and (iv) whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual presentation for post-surgical recovery.

123.    It is improbable, to the point of impossibility, that a legitimate physician would issue the same such prescription to dozens of similarly, but not identically, situated insureds.

124.    More so, it is extremely improbable, to the point of impossibility, that virtually every Insured identified in Exhibit "1" who underwent a minimally invasive surgical procedure would ultimately receive the same post-surgical treatment including prescriptions for the same two items of Fraudulent Equipment despite being differently situated.

125.    A substantial number of Insureds receiving virtually identical prescriptions for Fraudulent Equipment would, by extension, mean that all those Insureds had identical presentations for post-surgical recovery.

126.    It is extremely improbable, to the point of impossibility, that virtually every Insured identified in Exhibit "1" who underwent a minimally invasive surgical procedure exhibited identical presentations for post-surgical recovery such as would warrant the virtually identical prescriptions they received for the post-surgical Fraudulent Equipment.

127.    However, pursuant to the fraudulent treatment protocol implemented by the Supplier Defendants and healthcare providers – including the Referral Defendants – the Insureds were prescribed identical post-surgical Fraudulent Equipment without regard for the medical necessity of the Fraudulent Equipment, the Insureds' individual post-surgical presentation, or ability for post-surgical recovery.

128.    The predetermined fraudulent treatment protocols were designed to maximize the charges submitted by the Supplier Defendants to GEICO and other New York automobile insurers.

129.    In keeping with the fact that the prescriptions provided to the Supplier Defendants were not based on medical necessity but rather were issued pursuant to a predetermined

fraudulent protocol, virtually every Insured identified in Exhibit "1" who underwent a surgical procedure was provided with identical Fraudulent Equipment consisting of a CTU and a CPM regardless of the Insured's post-surgical presentation.

130.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of a predetermined fraudulent protocol, the prescribed Fraudulent Equipment had no medically necessary reason for being issued.

131.    A CPM is a machine that provides joint movement without active contraction of muscle groups, with the goal of increasing range of motion and promotion healing of joint surfaces.

132.    In a legitimate setting, there are only a limited number of circumstances where CPMs are medically necessary to aid in a patient's recovery. Circumstances where CPMs could be medically necessary include a total replacement of a patient's knee or shoulder, or repair of an anterior cruciate ligament.

133.    In support of the limit uses of CPMs, the Centers for Medicare and Medicaid Services issued a National Coverage Determination concluding that CPMs are only considered necessary after: (i) total knee arthroplasty; (ii) anterior cruciate ligament repair/reconstruction; (iii) during the non-weight-bearing period to promote healing after cartilage grafting procedures; and (iv) surgical release of arthrofibrosis of any joint.

134.    Moreover, and again in a legitimate setting, CPMs are not provided when patients undergo minimally invasive surgical procedures – such as an arthroscopic surgery – and when the patients can undergo traditional physical therapy. This is due to: (i) the ability for physical therapy to provide long-term benefits when CPMs cannot; and (ii) regularly accepted medical

studies that have concluded the use of CPMs in post-operative recovery do not provide any short-term or long-term benefit.

135.   In keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, virtually all of the Insureds identified in Exhibit "1" were each prescribed a post-surgical physical therapy regimen at the same time that a prescription for a CPM was issued.

136.   Unlike the Insureds identified in Exhibit "1" who were issued prescriptions for CPMs typically after an arthroscopic procedure, patients who undergo serious knee or shoulder surgery may have some short-term benefits by using CPMs to aid in quicker range of motion recovery.

137.   Even if the CPMs that were prescribed to the Insureds identified in Exhibit "1" were medically appropriate, the prescribed rental periods for the CPMs exceeded medical utility and did not comport with generally accepted medical guidelines.

138.   Although CPMs may have some short-term effect on patients who undergo serious joint surgeries – not the minimally invasive procedures performed on the Insureds identified in Exhibit "1" – CPMs provide no long-term benefit to patients who undergo serious joint surgeries, particularly when a patient is able to undergo a physical therapy regimen.

139.   To the extent that CPMs are medically appropriate, in a legitimate setting, CPMs will be prescribed for only a short-term period that is typically less than 10 days. Long term usage of CPMs – such as for up to six weeks – will not legitimately be prescribed as there is no evidence that the long-term use of CPMs provide any benefit to patients.

140.    In fact, the Centers for Medicare and Medicaid Services also stated that CPMs should be provided within 48 hours after surgery and the usual duration of treatment is 7-10 days, noting that there is insufficient evidence to justify the use of CPMs beyond 21 days.

141.    It is improbable that a legitimate physician would issue a prescription for a CPM to a patient post-arthroscopic surgery – let alone for up to six weeks of use – when that patient is ambulatory and is able to undergo traditional physical therapy.

142.    Furthermore, it is improbable – to the point of impossibility – that a legitimate physician would issue the same or substantially similar prescriptions for up to six weeks use of CPMs to dozens of post-arthroscopic surgical patients when those patients were ambulatory and able to undergo traditional physical therapy.

143.    In keeping with the fact that the CPMs prescribed to the Insureds identified in Exhibit "1" were not medically necessary, and were provided pursuant to a predetermined fraudulent protocol, the Insureds identified in Exhibit "1" were typically issued CPMs by the Supplier Defendants for up to six weeks at a time after arthroscopic surgeries that required little rehabilitation and when the Insureds were able to and did undergo traditional physical therapy.

144.    Similarly, the CTUs that were prescribed and issued to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol because they did not provide any additional medical benefit to Insureds

145.    As part of the predetermined fraudulent protocol, the Referral Defendants and other healthcare providers virtually always prescribed CTUs to the Insureds identified in Exhibit "1" after a surgical procedure and instructing that the CTUs to be used for up to six weeks after the surgeries.

146.     CTUs are effectively an ice-pack combined with compression to provide cold therapy to a part of a person's body. In fact, studies have concluded that CTUs are no more effective than using a standard ice pack.

147.     Where a patient is in a position to be able to place an ice-pack, there is no medically necessary reason to use a CTU. This is especially true considering that medical studies have shown no difference in recovery or functionality of patients using a CTU compared to an ice pack.

148.     Moreover, the use of cold-therapy – either in the form of an ice pack or a CTU – for post-operative patients to decrease swelling, including patients who undergo minimally invasive procedures such as arthroscopic surgery, is only effective during the first 48 hours after surgery.

149.     After the first 48 hours, cold-therapy is only helpful to post-arthroscopic surgery patients immediately after range of motion exercises performed during physical therapy. In that limited scenario, cold-therapy is typically provided by the physical therapist in the form of ice packs.

150.     It is improbable that a legitimate physician would issue a prescription for a CTU to a patient post-arthroscopic surgery – let alone for up to six weeks of use – when that patient is able to use ice-packs.

151.     In keeping with the fact that the CTUs prescribed to the Insureds identified in Exhibit "1" were not medically necessary, and were provided pursuant to a predetermined fraudulent protocol, the Insureds identified in Exhibit "1" were virtually always prescribed CTUs for weeks at a time when there was no objective evidence that the Insureds were unable to use an ice pack.

152.   In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols – and not based upon medical necessity – in addition to the prescriptions for Fraudulent Equipment, after undergoing arthroscopic procedures, the insureds were virtually always advised to – and typically did – undergo physical therapy.

153.   The purportedly prescribed Fraudulent Equipment is completely unnecessary given the lack of medical support and physical therapy treatments. In the context of post-operative treatment for minimally invasive procedures, especially arthroscopic procedures, no legitimate physician acting in each patient's best interest would prescribe the Fraudulent Equipment when the patients were able to – and ultimately did – undergo physical therapy at the same time.

154.   Upon information and belief, and in further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols – and not based upon medical necessity – the prescriptions for Fraudulent Equipment were never given to the Insureds but were routed directly to the Supplier Defendants.

155.   In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols – and not based upon medical necessity – during the Insureds follow-up examinations after their surgeries, to the extent that the Insureds went for a follow-up examination, the healthcare providers virtually never inquired about the prescriptions for the Fraudulent Equipment and whether it was necessary for the Insureds to continue using such equipment.

156.   In reality, for the reasons set forth above and below, all of the charges for Fraudulent Equipment identified in Exhibit "1" were not medically necessary and were provided

as part of predetermined fraudulent protocols. As such, the Supplier Defendants were never eligible for reimbursement of No-Fault Benefits.

> **1.    The Predetermined Fraudulent Treatment Protocol involving Diwan and Rispoli**

157.    Diwan and Rispoli, as part of a Englewood Ortho, either directly or with the assistance of third-party individuals not presently known, agreed to participate in a predetermined fraudulent protocol as a result of an unlawful financial arrangement with the Supplier Defendants where Diwan and Rispoli provided Insureds with prescriptions for Fraudulent Equipment.

158.    As a part of the fraudulent scheme, many of the Insureds in Exhibit "1" were, subsequent to their involvement in minor "fender-bender" motor vehicle accidents, purportedly referred to Englewood Ortho for an orthopedic consult and ultimately underwent minimally invasive arthroscopic surgery on a shoulder or knee joint by Diwan or Rispoli.

159.    Virtually every Insured identified in Exhibit "1" who treated by Diwan or Rispoli underwent a minor arthroscopic surgery and was issued identical prescriptions consisting of a six week rental of a CPM and CTU.

160.    In keeping with the fact that the prescriptions issued by Diwan and Rispoli to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the prescriptions for Fraudulent Equipment were written without evaluating each Insured's individual post-surgical presentation to determine whether and what type of DME was medically necessary for the Insured's post-surgical recovery.

161.    Furthermore, the identical prescriptions were issued by Diwan and Rispoli regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective post-operative complaints, or whether each patient would actually use the Fraudulent Equipment.

162.    Instead, in virtually all cases, the prescriptions for Fraudulent Equipment by Diwan and Rispoli to the Insureds identified in Exhibit "1" was based upon the predetermined fraudulent protocol established with the Supplier Defendants.

163.    For example:

(i)    On March 24, 2018 a patient named SM was purportedly involved in a motor vehicle accident. On September 21, 2018, Diwan, on behalf of Englewood Ortho, purportedly performed arthroscopic surgery on SM's left knee. After the surgery, Diwan issued SM a prescription for a CTU and CPM for six weeks that was provided to the Supplier Defendants.

(ii)    On September 22, 2018 a patient named EE was purportedly involved in a motor vehicle accident. On January 16, 2019 Diwan, on behalf of Englewood Ortho, purportedly performed an arthroscopic surgery on EE's right knee. After the surgery, Diwan issued EE a prescription for a CTU and CPM for six weeks that was provided to the Supplier Defendants.

(iii)    On November 21, 2018 a patient named RC was purportedly involved in a motor vehicle accident. On March 6, 2019, Diwan, on behalf of Englewood Ortho, purportedly performed arthroscopic surgery on RC's right shoulder. After the surgery, Diwan issued RC a prescription for a CTU and CPM for six weeks that was provided to the Supplier Defendants.

(iv)    On December 30, 2018 a patient named WB was purportedly involved in a motor vehicle accident. On April 26, 2019 Rispoli, on behalf of Englewood Ortho purportedly performed arthroscopic surgery on WB's left knee. After the surgery, Rispoli issued WB a prescription for a CTU and CPM for six weeks that was provided to the Supplier Defendants.

(v)    On January 3, 2019 a patient named CE was purportedly involved in a motor vehicle accident. On May 15, 2019, Diwan, on behalf of Englewood Ortho, purportedly performed arthroscopic surgery on CE's left shoulder. After the surgery, Diwan issued CE a prescription for a CTU and CPM for six weeks that was provided to the Supplier Defendants.

(vi)    On January 25, 2019 a patient named ET was purportedly involved in a motor vehicle accident. On June 13, 2019, Rispoli, on behalf of Englewood Ortho purportedly performed arthroscopic surgery on ET's left shoulder. After the surgery, Rispoli issued ET a prescription for a CTU and CPM for six weeks that was provided to the Supplier Defendants.

(vii)    On February 7, 2019 a patient named NG was purportedly involved in a motor vehicle accident. On May 17, 2019, Rispoli, on behalf of Englewood Ortho purportedly performed arthroscopic surgery on NG's right shoulder.

After the surgery, Rispoli issued NG a prescription for a CTU and CPM for six weeks that was provided to the Supplier Defendants.

(viii)   On March 27, 2019 a patient named OD was purportedly involved in a motor vehicle accident. On June 5, 2019 Diwan, on behalf of Englewood Ortho, purportedly performed arthroscopic surgery on OD's left knee. After the surgery Diwan issued OD a prescription for a CTU and CPM for six weeks that was provided to the Supplier Defendants.

(ix)   On May 11, 2019 a patient named AF was purportedly involved in a motor vehicle accident. On September 12, 2019 Rispoli, on behalf of Englewood Ortho purportedly performed arthroscopic surgery on AF's right knee. After the surgery, Rispoli issued AF a prescription for a CTU and CPM for six weeks that was provided to the Supplier Defendants.

(x)   On June 7, 2019 a patient named OW was purportedly involved in a motor vehicle accident. On September 12, 2019, Rispoli, on behalf of Englewood Ortho purportedly performed arthroscopic surgery on OW's left shoulder. After the surgery, Rispoli issued OW a prescription for a CTU and CPM for six weeks that was provided to the Supplier Defendants.

164.   These are only representative examples. In fact, virtually all of the Insureds identified in Exhibit "1" that underwent surgeries performed by Diwan or Rispoli received virtually identical prescriptions for a CTU and CPM for six weeks that was provided to the Supplier Defendants.

165.   In keeping with the fact that the prescriptions issued by Diwan and Rispoli to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the Fraudulent Equipment prescribed by Diwan and Rispoli did not provide any medical benefit to Insureds as the Insureds could completely recover full range of motion with limited physical therapy after their minimally invasive procedures.

166.   In further keeping with the fact that the Fraudulent Equipment prescribed by Diwan and Rispoli  were not medically necessary, and were provided pursuant to a predetermined fraudulent protocol, Diwan and Rispoli virtually always prescribed CPMs and CTU's to the Insureds identified in Exhibit "1" when the Insureds were also receiving physical therapy.

167.    Even if there was a medically necessary reason for issuing CPMs to the Insureds identified in Exhibit "1", which there was not, the CPMs prescribed by Diwan and Rispoli were not medically necessary and were provided pursuant to a predetermined fraudulent protocol because they virtually always prescribed CPMs for a six week period when CPMs are only helpful for a short term period of less than 10 days.

168.    Similarly, the CTUs that were prescribed by Diwan and Rispoli to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol because they did not provide any additional medical benefit to Insureds.

169.    In keeping with the fact that the CTUs prescribed by Diwan and Rispoli were not medically necessary, and were provided pursuant to a predetermined fraudulent protocol, Diwan and Rispoli virtually always prescribed CTUs when there was no objective evidence that the Insureds were unable to use an ice pack.

170.    Even if there was a medically necessary reason for issuing CTUs to the Insureds identified in Exhibit "1", which there was not, the CTUs prescribed by Diwan and Rispoli were not medically necessary and were provided pursuant to a predetermined fraudulent protocol because Diwan and Rispoli virtually always prescribed CPMs for a six weeks period when CTUs are only helpful, in lieu of an ice pack, for the first 48 hours after surgery.

171.    Furthermore, and in keeping with the fact that the prescriptions issued by Diwan and Rispoli to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, virtually all of the prescriptions issued by Diwan and Rispoli were unlawful as they were previously signed and duplicated.

172.     As part of the fraudulent scheme, Diwan and Rispoli, or someone acting at their direction or with their permission, issued prescriptions for the Fraudulent Equipment using previously signed prescriptions that were duplicated and then modified to include  the patients' name and a date for the prescription.

173.     For example, and as explained in more detail below, virtually all of the fraudulent charges identified in Exhibit "1" based upon prescriptions from Diwan were based upon unlawfully duplicated Official New York State Prescription forms that were previous filled out and signed. Thereafter, the unlawfully duplicated Official New York State Prescription forms were sent to the Supplier Defendants, pursuant to the predetermined fraudulent protocol, and used as the basis to submit fraudulent charges identified in Exhibit "1".

174.     In keeping with the fact that the charges identified in Exhibit "1" based upon prescriptions from Diwan were medically unnecessary and were based upon a predetermined protocol that involved using unlawfully duplicated Official New York State Prescription forms, multiple insureds were issued Official New York State Prescriptions forms signed by Diwan that contained the same unique prescription identification number and associated bar code.

175.     Examples of the duplicated prescriptions issued by Diwan are attached in Exhibit "2".

176.     Similarly, and also explained in more detail below, virtually all of the fraudulent charges identified in Exhibit "1" based upon prescriptions from Rispoli were based upon unlawfully duplicated State of New Jersey Prescription Blank forms that were previous filled out and signed. Thereafter, the unlawfully duplicated State of New Jersey Prescription Blank forms would be sent to the Supplier Defendants, pursuant to the predetermined fraudulent protocol, and used as the basis to submit fraudulent charges identified in Exhibit "1".

177.    In keeping with the fact that the charges identified in Exhibit "1" based upon prescriptions from Rispoli were medically unnecessary and were based upon a predetermined protocol that involved using unlawfully duplicated State of New Jersey Prescription Blank forms, multiple insureds were issued state prescription blank form signed by Rispoli that contained the same unique prescription identification number and associated bar code.

178.    Examples of the duplicated prescriptions issued by Rispoli are attached in Exhibit "3".

179.    No legitimate physician, chiropractor, other licensed healthcare provider would provide or permit an Official New York State Prescription form or State of New Jersey Prescription Blank form containing a prescription and signature to be photocopied and used as the basis for providing a prescription to multiple patients.

180.    In keeping with the fact that the charges identified in Exhibit "1" based upon prescriptions from Rispoli were medically unnecessary and were based upon a predetermined protocol that involved using unlawfully duplicated prescriptions, Rispoli never indicated or referenced the reasoning for issuing prescriptions for Fraudulent Equipment, let alone stating that he was issuing prescriptions for Fraudulent Equipment, anywhere in his surgical report or any other report.

181.    By contrast – in a legitimate setting – a healthcare provider would indicate in a contemporaneous report that he or she prescribed certain DME and why the DME was prescribed.

182.    Moreover, and in keeping with the fact that the prescriptions issued by Diwan and Rispoli were pursuant to a predetermined fraudulent protocol, when the Insureds conducted a follow-up examination with a healthcare provider from Englewood Ortho subsequent to the

surgeries performed by Diwan or Rispoli, the follow-up examinations virtually never documented the prescription for or continuous use of the Fraudulent Equipment.

183.    Upon information and belief, as part of the fraudulent scheme, the prescriptions issued by Diwan and Rispoli were never given to the Insureds but were routed directly to the Supplier Defendants, thus taking any risk out that an Insured would fill the prescription from an outside source or not fill all or part of the prescription.

### 2.    The Predetermined Fraudulent Treatment Protocol involving Capiola and Sharma

184.    Capiola and Sharma, as part of NY Sports & Joints, either directly or with the assistance of third-party individuals not presently known, agreed to participate in a predetermined fraudulent protocol as a result of an unlawful financial arrangement with the Supplier Defendants where Capiola and Sharma provided the Insureds with prescriptions for Fraudulent Equipment.

185.    As a part of the fraudulent scheme, many of the Insureds in Exhibit "1" were, subsequent to their involvement in minor "fender-bender" motor vehicle accidents, purportedly referred to NY Sports & Joints for an orthopedic consult and ultimately underwent minimally invasive arthroscopic surgery on a shoulder, knee, ankle or elbow.

186.    Virtually every Insured identified in Exhibit "1" who treated with NY Sports & Joints – including Capiola or Sharma – underwent a minor arthroscopic surgery and was issued a virtually identical prescription for a CPM and a CTU for a period between two and four weeks.

187.    In keeping with the fact that the prescriptions issued by Capiola and Sharma to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the prescriptions for Fraudulent Equipment were written without evaluating each Insured's individual post-surgical presentation to determine whether and what type of DME was medically necessary for the Insured's post-surgical recovery.

188.    Additionally, Capiola and Sharma issued the prescriptions for Fraudulent Equipment regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective post-operative complaints, or whether each patient would actually use the Fraudulent Equipment.

189.    Instead, in virtually all cases, the prescriptions for Fraudulent Equipment by Capiola and Sharma to the Insureds identified in Exhibit "1" was based upon the predetermined fraudulent protocol established with the Supplier Defendants.

190.    For example:

    (i)    On August 30, 2017 a patient named AM was purportedly involved in a motor vehicle accident. On August 10, 2018 Sharma, on behalf of NY Sports & Joints, purportedly performed arthroscopic surgery on AM's left ankle. After the surgery, Sharma issued AM a prescription for a CTU and CPM for four weeks that was provided to the Supplier Defendants.

    (ii)    On June 15, 2018 a patient named EL was purportedly involved in a motor vehicle accident. On June 26, 2019 Capiola, on behalf of NY Sports & Joints, purportedly performed arthroscopic surgery on EL' left knee. After the surgery, Capiola issued EL a prescription for a CTU for three weeks and CPM for three weeks that was provided to the Supplier Defendants.

    (iii)    On August 3, 2018 a patient named GM was purportedly involved in a motor vehicle accident. On January 4, 2019 Sharma, on behalf of NY Sports & Joints, purportedly performed arthroscopic surgery on GM's left ankle. After the surgery, Sharma issued GM a prescription for a CTU and CPM for four weeks that was provided to the Supplier Defendants.

    (iv)    On August 21, 2018 a patient named CA was purportedly involved in a motor vehicle accident. On November 1, 2019 Sharma, on behalf of NY Sports & Joints, purportedly performed arthroscopic surgery on CA's right ankle. After the surgery, Sharma issued CA a prescription for a CTU and CPM for four weeks that was provided to the Supplier Defendants.

    (v)    On October 3, 2018 a patient named TK was purportedly involved in a motor vehicle accident. On February 7, 2019 Capiola, on behalf of NY Sports & Joints, purportedly performed arthroscopic surgery on TK's right knee. After the surgery, Capiola issued TK a prescription for a CTU for two weeks and a CPM for four weeks that was provided to the Supplier Defendants.

    (vi)     On December 3, 2018 a patient named SM was purportedly involved in a motor vehicle accident. On January 25, 2019 Sharma, on behalf of NY Sports & Joints, purportedly performed arthroscopic surgery on SM's left ankle. After the surgery, Sharma issued SM a prescription for a CTU and CPM for four weeks that was provided to the Supplier Defendants.

    (vii)    On February 13, 2019 a patient named FM was purportedly involved in a motor vehicle accident. On November 7, 2019 Capiola, on behalf of NY Sports & Joints, purportedly performed arthroscopic surgery on FM's left shoulder. After the surgery, Capiola issued FM a prescription for a CTU for two weeks and a CPM for four weeks that was provided to the Supplier Defendants.

    (viii)   On May 11, 2019 a patient named NM was purportedly involved in a motor vehicle accident. On October 3, 2019 Capiola, on behalf of NY Sports & Joints, purportedly performed an arthroscopic surgery on NM's right shoulder. After the surgery, Capiola issued NM a prescription for a CTU for two weeks and CPM for four weeks that was provided to the Supplier Defendants.

    (ix)     On August 27, 2019 a patient named LT was purportedly involved in a motor vehicle accident. On December 5, 2019 Capiola, on behalf of NY Joints & Sports, purportedly performed arthroscopic surgery on LT's right shoulder. After the surgery, Capiola issued LT a prescription for a CTU for two weeks and a CPM for four weeks that was provided to the Supplier Defendants.

    (x)     On March 16, 2019 a patient named ES was purportedly involved in a motor vehicle accident. On October 4, 2019 Sharma, on behalf of NY Sports & Joints purportedly performed arthroscopic surgery on ES's right ankle. After the surgery, Sharma issued ES a prescription for a CTU and CPM for four weeks that was provided to the Supplier Defendants.

191.    These are only representative examples. In fact, virtually all of the Insureds identified in Exhibit "1" that underwent surgeries performed by Capiola and Sharma received virtually identical prescriptions for a CTU and CPM for a period between two and four weeks that was provided to the Supplier Defendants.

192.    In keeping with the fact that the prescriptions issued by Capiola and Sharma to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the Fraudulent Equipment prescribed by Capiola and Sharma

did not provide any medical benefit to Insureds as the Insureds could completely recover full range of motion with limited physical therapy after their minimally invasive procedures.

193.    As explained above, in a legitimate setting, there are only a limited number of circumstances where CTUs and CPMs are medically necessary to aid in a patient's recovery.

194.    Similar to the prescriptions from Diwan and Rispoli, and in keeping with the fact that the Fraudulent Equipment prescribed by Sharma and Capiola were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, Sharma and Capiola virtually always prescribed CPMs and CTU's to the Insureds identified in Exhibit "1" after minimally invasive arthroscopic surgeries when the Insureds were also receiving physical therapy.

195.    Even if there was a medically necessary reason for issuing CPMs to the Insureds identified in Exhibit "1", which there was not, the CPMs prescribed by Sharma and Capiola were not medically necessary and were provided pursuant to a predetermined fraudulent protocol because they virtually always prescribed CPMs for periods of two to four weeks when CPMs are only helpful for a short term period of less than 10 days.

196.    Additionally, the CTUs that were prescribed by Sharma and Capiola to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol because they did not provide any additional medical benefit to Insureds.

197.    In keeping with the fact that the CTUs prescribed by Sharma and Capiola were not medically necessary, and were provided pursuant to a predetermined fraudulent protocol, virtually always prescribed CTUs when there was no objective evidence that the Insureds were unable to use an ice pack.

198.   Even if there was a medically necessary reason for issuing CTUs to the Insureds identified in Exhibit "1", which there was not, the CTUs prescribed by Sharma and Capiola were not medically necessary and were provided pursuant to a predetermined fraudulent protocol because Sharma and Capiola virtually always prescribed CTUs for periods of two to four weeks at a time when CTUs are only helpful, in lieu of an ice pack, for the first 48 hours after surgery.

199.   In also keeping with the fact that the prescriptions by Capiola and Sharma to the Insureds identified in Exhibit "1" were not medically necessary but were based upon a predetermined fraudulent protocol, neither Capiola nor Sharma ever indicated in their surgery reports or any other report why they prescribed the Fraudulent Equipment, or even – more generally – that they prescribed the Fraudulent Equipment.

200.   Moreover, and in also keeping with the fact that the prescriptions issued by Capiola and Sharma were pursuant to a predetermined fraudulent protocol, when the Insureds conducted a follow-up examination with a healthcare provider from NY Sports & Joints subsequent to the surgeries performed by Capiola or Sharma, the follow-up examinations virtually never documented the prescription or continuous use of the Fraudulent Equipment.

201.   Furthermore, and in keeping with the fact that the prescriptions issued by Sharma to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, virtually all of the prescriptions issued by Sharma were issued using pre-printed, check-box style prescription forms that did not contain an original signature from Sharma.

202.   In keeping with the fact that the prescriptions by Sharma for the Fraudulent Equipment identified in Exhibit "1" were not originals, virtually all of the prescriptions were based upon a photocopy or a stamp of Sharma's signature.

203.    Upon information and belief, as part of the predetermined fraudulent protocol with the Supplier Defendants, either directly or through third-parties who are presently unidentifiable, Sharma either used or permitted someone else to use a photocopy or stamp of his signature to issue the medically unnecessary prescriptions.

**D.      The Unlawful Distribution of Fraudulent Equipment by Reliable CPM to Insureds Without Valid Prescriptions**

204.    Reliable CPM is not a licensed medical professional corporation and neither Dadashev nor Solomonov are licensed healthcare providers. As such, the Supplier Defendants were not lawfully permitted to rent DME to an Insured without a valid prescription from a licensed healthcare professional.

205.    In a significant majority of the fraudulent claims identified in Exhibit "1" the Supplier Defendants improperly provided DME to Insureds without a valid prescription from a licensed healthcare provider because the prescriptions were unlawfully duplicated.

206.    For example, and as described above, as part of the predetermined fraudulent protocol between Diwan and Rispoli and the Supplier Defendants, the Supplier Defendants were provided with duplicated, previously filled out and signed, prescriptions for medically unnecessary Fraudulent Equipment that were used as the basis to support the charges for many Insureds identified in Exhibit "1".

207.    In fact, a significant portion of the fraudulent charges identified in Exhibit "1" were based upon two unlawfully duplicated Official New York State Prescription forms that were previously filled out and signed by Diwan (the "Duplicated Diwan Prescriptions"), and four unlawfully duplicated State of New Jersey Prescription Blanks that were previously filled out and signed by Rispoli (the "Duplicated Rispoli Prescriptions") (collectively the "Duplicated Prescriptions").

208.   The Duplicated Diwan Prescriptions were virtually always issued in one of two ways, as follows:

(i)   An Official New York State Prescription form with prescription identification number "0SPMCS 44" contained Diwan's signature and a prescription for a "Cryotherapy/CPM" for a "knee x 6 wks." This prescription would be modified to indicate the left or right knee.

(ii)   An Official New York State Prescription form with prescription identification number "0SPMCS 45" contained Diwan's signature and a prescription for a "Cryotherapy/CPM" for a "shoulder 6 wks." This prescription would be modified to indicate the left or right shoulder.

209.   The Duplicated Rispoli Prescriptions were virtually always prescribed in one of four ways, as follows:

(i)   A State of New Jersey Prescription Blank with prescription identification number "MSJMY0812000951" contained Rispoli's signature and a prescription for a "Cryotherapy/CPM to Right Knee x 6 wks (six) Monitor Skin Tolerance to Modalities."

(ii)   A State of New Jersey Prescription Blank with prescription identification number "MSJMY0812000952" contained Rispoli's signature and a prescription for a "Cryotherapy/CPM to Left Knee x 6 wks (six) Monitor Skin Tolerance to Modalities."

(iii)   A State of New Jersey Prescription Blank with prescription identification number "MSJMY0812000953" contained Rispoli's signature and a prescription for a "Cryotherapy/CPM to Left Shoulder x 6 wks (six) Monitor Skin Tolerance to Modalities."

(iv)   A State of New Jersey Prescription Blank with prescription identification number "MSJMY0812000954" contained Rispoli's signature and a prescription for a "Cryotherapy/CPM to Right Shoulder x 6 wks (six) Monitor Skin Tolerance to Modalities."

210.   In keeping with the fact that virtually all of the charges identified in Exhibit "1" based upon prescriptions from Diwan were from the unlawful Duplicated Diwan Prescriptions, the Supplier Defendants submitted charges to GEICO for Fraudulent Equipment purportedly provided to multiple Insureds and attached Official New York State Prescription forms signed by

Diwan that contained the unique prescription identification numbers associated within the Duplicated Diwan Prescriptions.

211.    In keeping with the fact that virtually all of the charges identified in Exhibit "1" based upon prescriptions from Rispoli were from the unlawful Duplicated Rispoli Prescriptions, the Supplier Defendants submitted charges to GEICO for Fraudulent Equipment purportedly provided to multiple Insureds and attached State of New Jersey Prescription Blank forms signed by Rispoli that contained the unique prescription identification numbers associated within the Duplicated Rispoli Prescriptions.

212.    In a legitimate setting, healthcare providers use Official New York State Prescription forms and State of New Jersey Prescription Blank forms to issue prescriptions for a variety of matters. Moreover, when a healthcare provider legitimately issues a prescription using an Official New York State Prescription form or State of New Jersey Prescription Blank, the healthcare provider will only be able to use each form on one occasion.

213.    Each Official New York State Prescription form and State of New Jersey Prescription Blank can only be used on one occasion because each form has a unique prescription identification number, which is an alphanumeric number and corresponding barcode.

214.    Moreover, when a copy is made of an Official New York State Prescription form, the word "VOID" appears multiple times on the form.

215.    Both the inclusion of a unique prescription identification code on each prescription form and the appearance of the word "VOID" on a prescription when it is photocopied are security features designed to deter the unlawful duplication of previously filled prescription forms.

216.     In a legitimate setting, a healthcare provider using an Official New York State Prescription form or a State of New Jersey Prescription Blank form provides each patient with an individual prescription form that contains a unique identification number for each prescription.

217.     By contrast, the Supplier Defendants submitted charges to GEICO for multiple Insureds identified in Exhibit "1" that were based upon one of the Duplicated Prescriptions that contained the same unique prescription identification number.

218.     For example:

(i)      On March 24, 2018, a patient named SM was purportedly involved in a motor vehicle accident. On or around September 21, 2018 an Official New York State Prescription form was provided to the Supplier Defendants in the name of SM with a prescription for "Cryotherapy/CPM to L-Knee 6 wks". The prescription was signed by Diwan and contained the unique prescription identification number 0SPMCS44. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(ii)     On May 12, 2018, a patient named BM was purportedly involved in a motor vehicle accident. On or around February 20, 2019 an Official New York State Prescription form was provided to the Supplier Defendants in the name of BM with a prescription for "Cryotherapy/CPM to R-Knee 6 wks". The prescription was signed by Diwan and contained the unique prescription identification number 0SPMCS44. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(iii)    On August 8, 2018, a patient named RB was purportedly involved in a motor vehicle accident. On or around December 19, 2018 an Official New York State Prescription form was provided to the Supplier Defendants in the name of RB with a prescription for "Cryotherapy/CPM to L-Knee 6 wks". The prescription was signed by Diwan and contained the unique prescription identification number 0SPMCS44. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(iv)     On September 22, 2018, a patient named EE was purportedly involved in a motor vehicle accident. On or around January 16, 2019 an Official New York State Prescription form was provided to the Supplier Defendants in the name of EE with a prescription for "Cryotherapy/CPM to R-Knee 6 wks". The prescription was signed by Diwan and contained the unique prescription identification number 0SPMCS44. Based upon this

prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(v)     On November 17, 2018, a patient named ND was purportedly involved in a motor vehicle accident. On or around January 23, 2019 an Official New York State Prescription form was provided to the Supplier Defendants in the name of ND with a prescription for "Cryotherapy/CPM to R-Shoulder 6 wks". The prescription was signed by Diwan and contained the unique prescription identification number 0SPMCS45. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(vi)    On November 21, 2018, a patient named RC was purportedly involved in a motor vehicle accident. On or around March 6, 2019, an Official New York State Prescription form was provided to the Supplier Defendants in the name of RC with a prescription for "Cryotherapy/CPM to R-Shoulder 6 wks". The prescription was signed by Diwan and contained the unique prescription identification number 0SPMCS45. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(vii)   On December 22, 2018, a patient named DR was purportedly involved in a motor vehicle accident. On or around February 6, 2019, an Official New York State Prescription form was provided to the Supplier Defendants in the name of DR with a prescription for "Cryotherapy/CPM to R-Shoulder 6 wks". The prescription was signed by Diwan and contained the unique prescription identification number 0SPMCS45. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(viii)  On December 30, 2018, a patient named WB was purportedly involved in a motor vehicle accident. On or around April 26, 2019 a New Jersey Prescription Blank form was provided to the Supplier Defendants in the name of WB with a prescription for "Cryotherapy/CPM to Left Knee 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number MSJMY0814000952. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(ix)    On January 3, 2019, a patient named CE was purportedly involved in a motor vehicle accident. On or around May 15, 2019, an Official New York State Prescription form was provided to the Supplier Defendants in the name of CE with a prescription for "Cryotherapy/CPM to L-Shoulder 6 wks". The prescription was signed by Diwan and contained the unique prescription identification number 0SPMCS45. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(x)     On January 15, 2019, a patient named LD was purportedly involved in a motor vehicle accident. On or around April 19, 2019, an Official New York State Prescription form was provided to the Supplier Defendants in the name of LD with a prescription for "Cryotherapy/CPM to L-Shoulder 6 wks". The prescription was signed by Diwan and contained the unique prescription identification number 0SPMCS45. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(xi)    On January 25, 2019, a patient named ET was purportedly involved in a motor vehicle accident. On or around June 13, 2019 a New Jersey Prescription Blank form was provided to the Supplier Defendants in the name of ET with a prescription for "Cryotherapy/CPM to Left Shoulder 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number MSJMY0814000953. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(xii)   On February 7, 2019, a patient named NG was purportedly involved in a motor vehicle accident. A New Jersey Prescription Blank form that was not dated was provided to the Supplier Defendants in the name of NG with a prescription for "Cryotherapy/CPM to Right Shoulder 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number MSJMY0814000954. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(xiii)  On March 19, 2019, a patient named MR was purportedly involved in a motor vehicle accident. On or around September 12, 2019 a New Jersey Prescription Blank form was provided to the Supplier Defendants in the name of MR with a prescription for "Cryotherapy/CPM to Right Shoulder 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number MSJMY0814000954. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(xiv)   On March 27, 2019, a patient named DO was purportedly involved in a motor vehicle accident. On or around June 5, 2019 an Official New York State Prescription form was provided to the Supplier Defendants in the name of DO with a prescription for "Cryotherapy/CPM to L Knee 6 wks". The prescription was signed by Diwan and contained the unique prescription identification number 0SPMCS44. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(xv)    On May 6, 2019, a patient named SE was purportedly involved in a motor vehicle accident. On or around July 12, 2019 a New Jersey Prescription

Blank form was provided to the Supplier Defendants in the name of SE with a prescription for "Cryotherapy/CPM to <u>Right</u> Shoulder 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number <u>MSJMY0814000954</u>. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(xvi)   On May 11, 2019, a patient named AF was purportedly involved in a motor vehicle accident. On or around September 12, 2019 an Official New York State Prescription form was provided to the Supplier Defendants in the name of AF with a prescription for "Cryotherapy/CPM to <u>Right</u> Knee 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number <u>MSJMY0814000951</u>. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling over $5,000.00.

(xvii)   On June 3, 2019, a patient named PW was purportedly involved in a motor vehicle accident. On or around September 12, 2019 a New Jersey Prescription Blank form was provided to the Supplier Defendants in the name of PW with a prescription for "Cryotherapy/CPM to <u>Right</u> Shoulder 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number <u>MSJMY0814000954</u>. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling nearly $3,000.00.

(xviii)   On June 7, 2019, a patient named OW was purportedly involved in a motor vehicle accident. On or around September 12, 2019 a New Jersey Prescription Blank form was provided to the Supplier Defendants in the name of OW with a prescription for "Cryotherapy/CPM to <u>Left</u> Shoulder 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number <u>MSJMY0814000953</u>. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(xix)   On June 24, 2019, a patient named LW was purportedly involved in a motor vehicle accident. On or around August 18, 2019 a New Jersey Prescription Blank form was provided to the Supplier Defendants in the name of LW with a prescription for "Cryotherapy/CPM to <u>Right</u> Shoulder 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number <u>MSJMY0814000954</u>. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling nearly $3,000.00.

(xx)   On July 7, 2019, a patient named JM was purportedly involved in a motor vehicle accident. On or around August 29, 2019 a New Jersey Prescription Blank form was provided to the Supplier Defendants in the name of JM with a prescription for "Cryotherapy/CPM to <u>Left</u> Shoulder 6 wks (six)

Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number MSJMY0814000953. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(xxi)     On July 25, 2019, a patient named JS was purportedly involved in a motor vehicle accident. On or around September 12, 2019 a New Jersey Prescription Blank form was provided to the Supplier Defendants in the name of JS with a prescription for "Cryotherapy/CPM to Left Shoulder 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number MSJMY0814000953. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(xxii)    On July 29, 2019, a patient named JS was purportedly involved in a motor vehicle accident. On or around October 17, 2019 a New Jersey Prescription Blank form was provided to the Supplier Defendants in the name of JS with a prescription for "Cryotherapy/CPM to Left Shoulder 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number MSJMY0814000953. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(xxiii)   On August 20, 2019, a patient named TW was purportedly involved in a motor vehicle accident. On or around January 30, 2020 an Official New York State Prescription form was provided to the Supplier Defendants in the name of TW with a prescription for "Cryotherapy/CPM to Right Knee 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number MSJMY0814000951. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling over $5,000.00.

(xxiv)    On September 18, 2019, a patient named LP was purportedly involved in a motor vehicle accident. On or around October 24, 2019 a State of New Jersey Prescription Blank form was provided to the Supplier Defendants in the name of LP with a prescription for "Cryotherapy/CPM to Left Knee 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number MSJMY0814000952. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling more than $5,000.00.

(xxv)     On October 19, 2019, a patient named JC was purportedly involved in a motor vehicle accident. On or around December 12, 2019 a New Jersey Prescription Blank form was provided to the Supplier Defendants in the name of JC with a prescription for "Cryotherapy/CPM to Left Knee 6 wks (six) Monitor Skin Tolerance to Modalities". The prescription was signed by Rispoli and contains the unique prescription identification number

MSJMY0814000952. Based upon this prescription, the Supplier Defendants submitted charges to GEICO totaling nearly $3,000.00.

219.    These are only representative examples. Virtually all of the fraudulent charges identified in Exhibit "1" that were based upon prescriptions issued by Diwan and Rispoli were unlawful Duplicated Prescriptions as shown by multiple Insureds obtaining prescriptions containing the same unique prescription identification number.

220.    In keeping with the fact that the fraudulent charges identified in Exhibit "1" based on the Duplicated Diwan Prescriptions were unlawful, all of the Duplicated Diwan Prescriptions were void as the word "VOID" was contained multiple times on each of the Duplicated Diwan Prescriptions received by the Supplier Defendants.

221.    Upon information and belief, the Supplier Defendants knew that the prescriptions from Diwan and Rispoli that supported the charges identified in Exhibit "1" were unlawful, as it was part of the fraudulent scheme created between the Supplier Defendants and Diwan and Rispoli as a result of the unlawful financial arrangement, either directly or through presently unidentified third-parties.

222.    Despite the Supplier Defendants knowing that the prescriptions received from Diwan and Rispoli were unlawful, the Supplier Defendants submitted the Duplicated Prescriptions to GEICO as the basis to support the fraudulent charges identified in Exhibit "1" solely for their own financial enrichment.

223.    To the extent that the Supplier Defendants actually provided the Fraudulent Equipment to the Insureds, the Fraudulent Equipment was unlawfully prescribed by the Supplier Defendants because the prescriptions used as a basis to support the charges identified in Exhibit "1" were unlawfully duplicated. As a result, the Supplier Defendants were never eligible for reimbursement of No-Fault Benefits.

E.      **The Supplier Defendants' Fraudulent Billing for DME**

224.    In addition to misrepresenting that the Fraudulent Equipment were based upon lawful prescriptions for medically necessary DME from healthcare providers, the bills submitted to GEICO and other New York automobile insurers by the Supplier Defendants were also fraudulent in that they misrepresented the permissible reimbursement amounts for the Fraudulent Equipment.

225.    In the bills and other documents submitted to GEICO, the Supplier Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were based – not upon medical necessity but – solely on predetermined fraudulent protocols due to the unlawful financial arrangements between the Supplier Defendants and healthcare providers, including the Referral Defendants, either directly or through third-parties who are not presently known.

226.    Further, the Supplier Defendants misrepresented in the bills submitted to GEICO that the Fraudulent Equipment purportedly provided to Insureds were based upon lawful prescriptions when many of the charges identified in Exhibit "1" were based upon unlawfully duplicated Official New York State Prescription forms and State of New Jersey Prescription Blank forms.

227.    Moreover, the bills submitted to GEICO by the Supplier Defendants fraudulently misrepresented that the charges for the DME that was rented and the accessories that were provided were for permissible reimbursement rates, when they were not.

228.    As stated above, the New York Fee Schedule sets forth a maximum permissible rental charge, on a monthly basis, for renting equipment, supplies and services. For Non-Fee Schedule items, which includes the Fraudulent Equipment, the total monthly rental charges for

equipment, supplies, and services is no greater than the average monthly cost to the general public.

229.    When the Supplier Defendants' submitted bills to GEICO seeking payment for the Fraudulent Equipment, each of the charges identified HCPCS codes that were used to describe the items purportedly rented or provided to the Insureds.

230.    When the Supplier Defendants submitted bills to GEICO seeking payment for the rental of Non-Fee Schedule items, which included CTUs billed under HCPCS Code E0217 and CPMs billed under HCPCS Codes E0935 and E0936, the Supplier Defendants fraudulently misrepresented that the charges were within the maximum permissible amount.

231.    As shown by the charges identified in Exhibit "1", when the Supplier Defendants submitted bills to GEICO for the rental of CTUs, the rentals were for periods between two and six weeks and at a rate of $49.99 per day, resulting in charges between $699.86 and $2,099.68 per Insured.

232.    The charges submitted by the Supplier Defendants fraudulently misrepresented the maximum reimbursement amount for the rental of CTUs as the cost to the public for the devices is only a fraction of what was charged to GEICO.

233.    During GEICO's investigation into the Supplier Defendants, GEICO was able to determine that the rental price available to the public for similar CTUs. For example, CTUs were available for rent via the internet at: (i) Oswaldspharmacy.com for $30.00 per week or $90.00 per month; (ii) renticetherapy.com for $110 per month; (iii) Dmes.com for $75.00 per two weeks; and (iv) bellevuehealthcare.com for $55.00 per month.

234.    In virtually all of the charges submitted to GEICO for the rental of CTUs, the Supplier Defendants fraudulently sought reimbursement at a rate of $49.99 per day when the

maximum reimbursement charge was no greater than the cost to the general public, which was at maximum a rate between approximately $5.00 per day for a two-week period and $3.00 per day for a six-week period.

235.    In keeping with the fact that the rental prices for CTUs were grossly above the price to the general public for renting such equipment, the cheap and inexpensive CTUs that were provided to the Insureds were generally available for purchase for less than $200.00, which is the equivalent of a four-day rental at the rates submitted by the Supplier Defendants.

236.    As also identified in Exhibit "1", when the Supplier Defendants submitted bills to GEICO for the rental of shoulder, ankle, and elbow CPMs under HCPCS Code E0936, the rentals were for periods between two and six weeks and at a rate of $85.00 per day, resulting in charges between $1,190.00 to $3,570.00 per Insured.

237.    The charges submitted by the Supplier Defendants fraudulently misrepresented the maximum reimbursement amount for the rental of shoulder, ankle, and elbow CPMs under HCPCS Code E0936 as the cost to the public for the devices is only a fraction of what was charged to GEICO.

238.    During GEICO's investigation into the Supplier Defendants, GEICO was able to determine that the rental price available to the public for similar shoulder, elbow, and knee CPMs.

239.    For example, shoulder CPMs were available for rent via the internet at medcomgroup.com for $775.00 per two-week period and $1,275.00 for a six-week period. Similarly, elbow CPMs and ankle CPMs were available for rent via the internet at medcomgroup.com for $775.00 per two-week period and $1,175.00 for a six-week period.

240.    In virtually all of the charges submitted to GEICO for the rental of CPMs under HCPCS Code E0936, the Supplier Defendants fraudulently sought reimbursement at a rate of

$85.00 per day, when the maximum reimbursement charge was no greater than the cost to the general public, which was at maximum a rate between approximately $55.00 per day for a two-week period and $30.00 per day for a six-week period.

241.     The charges identified in Exhibit "1" also show that when the Supplier Defendants submitted bills to GEICO for the rental of knee CPMs under HCPCS Code E0935, the rentals were for periods between two and six weeks and at a rate of $85.00 per day, resulting in charges between $1,190.00 to $3,570.00 per Insured.

242.     The charges submitted by the Supplier Defendants fraudulently misrepresented the maximum reimbursement amount for the rental of knee CPMs under HCPCS Code E0935 as the cost to the public for the devices is only a fraction of what was charged to GEICO.

243.     During GEICO's investigation into the Supplier Defendants, GEICO was able to determine that the rental price available to the public for similar knee CPMs. For example, knee CPMs were available for rent via the internet at medcomgroup.com for, depending upon the brand: (i)$375.00 per two-week period and $775.00 for a six-week period; or (ii) $425.00 per two-week period and $825.00 per six-week period.

244.     In virtually all of the charges submitted to GEICO for the rental of knee CPMs, the Supplier Defendants fraudulently sought reimbursement at a rate of $85.00 per day when the maximum reimbursement charge was no greater than the cost to the general public, which was at maximum a rate between approximately $31.00 per day for a two-week period and $20.00 per day for a six-week period.

245.     In keeping with the fact that the charges for the rental of CPMs were grossly above the maximum reimbursable amount, which is the price to the general public, the same type of CPMs that were rented to the Insureds identified in Exhibit "1" were available for purchase at a

cost that is less than amount charged to GEICO by the Supplier Defendants for a four-week rental.

246.    In an effort to further their scheme, upon information and belief, the Supplier Defendants purposefully avoided researching the cost to the general public of the Fraudulent Equipment purportedly provided to the Defendants.

247.    Upon information and belief, the Supplier Defendants purposefully avoided researching the cost to the general public of Fraudulent Equipment they purportedly provided because they knew that the Fraudulent Equipment they rented cost significantly less to the general public than the amounts they charged and submitted to GEICO and other automobile insurers.

248.    Along with the charges for the rental of CTUs and CPMs, the Supplier Defendants virtually always submitted an additional charge of $99.99 for "DME Servicing, Parts Repair" using HCPCS Code A9900 the first time they rented Fraudulent Equipment to an Insured.

249.    However, the Supplier Defendants fraudulently misrepresented that they were entitled to submit a charge for repairing or servicing rental DME using HCPCS Code A9900. HCPCS Code A9900 is for the repair or replacement of the equipment or part for patient-owned devices, not devices that are rented.

250.    In keeping with the Supplier Defendants fraudulently submitted charges for servicing the Fraudulent Equipment rented to Insureds using HCPCS Code A9900, the reimbursement rate for rental DME includes all equipment, delivery, maintenance and repair costs, parts, supplies and service for equipment set-up, and replacement of worn essential parts or accessories.

251.     By contrast, when the Supplier Defendants submitted charges to GEICO, and other insurers, under HCPCS Code A9900, they were charging GEICO for services that were included within the reimbursement rate of renting the Fraudulent Equipment.

252.     The Supplier Defendants submitted charges to GEICO and other automobile insurers using HCPCS Code A9900 in order to maximize the amount of No-Fault Benefits that they could receive.

253.     In each of the claims identified within Exhibit "1", the Supplier Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges for the Fraudulent Equipment were less than or equal to the maximum reimbursement amount for each item and that they were entitled to reimbursement of the cost for purportedly servicing the rental DME.

## III.   The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

254.     To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the name of Reliable CPM, seeking payment for Fraudulent Equipment.

255.     The NF-3 forms, HCFA-1500 forms and treatment reports that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

> (i)     The NF-3 forms, HCFA-1500 forms, treatment reports, and prescriptions uniformly misrepresented to GEICO that the Supplier Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and therefore were eligible to receive No-Fault Benefits. In fact, the Supplier Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Supplier Defendants provided any of the Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with healthcare providers, including the Referral Defendants, either directly or through third-parties who are presently unidentifiable; (b) predetermined fraudulent protocols

without regard for the medical necessity of the items; and (c) fraudulent, duplicated, and void prescriptions issued by the Referral Defendants and other healthcare providers.

(ii)     The NF-3 forms, HCFA-1500 forms, treatment reports, and prescriptions uniformly misrepresented to GEICO the reimbursement amount for Non-Fee Schedule items and Fraudulent Equipment provided to the Insureds, to the extent that the Supplier Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, the Supplier Defendants were not entitled to receive No-Fault Benefits because – to the extent any Fraudulent Equipment was provided – the bills falsified that the charges to GEICO were less than or equal to the maximum permissible reimbursement amount for the charges identified in the NF-3 forms, HCFA-1500 forms, treatment reports, and prescriptions.

IV.     **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

256.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

257.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

258.    Specifically, they knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were – not based upon medical necessity but – based upon predetermined fraudulent protocols as a result of unlawful financial arrangements, were provided to the Supplier Defendants, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

259.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon predetermined protocols and without medical necessity in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

260.   Furthermore, the Supplier Defendants failed to submit, with their initial submissions, invoices or other documentation to corroborate the charges for the Fraudulent Equipment.

261.   Additionally, the Defendants knowingly misrepresented and concealed that the Fraudulent Equipment was dispensed pursuant to unlawful, duplicated, and void prescriptions, in order to prevent GEICO from discovering that the Fraudulent Equipment was billed to GEICO for the Supplier Defendants' financial gain.

262.   Lastly, the Defendants knowingly misrepresented the permissible reimbursement amount of the Fraudulent Equipment contained in the bills submitted by the Supplier Defendants to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

263.   Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate. Nevertheless, in an attempt to conceal their fraud, the Defendants failed and/or refused to respond to all of GEICO's requests for verification of the charges submitted.

264.   GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

265.   In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional

verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

266.    The Supplier Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

267.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $290,000.00 based upon the fraudulent charges.

268.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Reliable CPM**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

269.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 268 of this Complaint as if fully set forth at length herein.

270.    There is an actual case in controversy between GEICO and Reliable CPM regarding more than $660,000.00 in fraudulent billing that has been submitted to GEICO in the name of Reliable CPM.

271.    Reliable CPM has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements.

272.    Reliable CPM also has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Supplier Defendants, the other Defendants, and others who are not presently known, rather than to treat the Insureds.

273.    Reliable CPM has no right to receive payment for any pending bills submitted to GEICO because Reliable CPM purportedly provided Fraudulent Equipment as a result of unlawful prescriptions issued by healthcare providers.

274.    Reliable CPM has no right to receive payment for any pending bills submitted to GEICO because – to the extent that Reliable CPM provided any Fraudulent Equipment – Reliable CPM fraudulently misrepresented that the charges for Fraudulent Equipment contained within the bills they submitted to GEICO were less than the maximum permissible reimbursement amount.

275.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Reliable CPM.

**SECOND CAUSE OF ACTION**
**Against Solomonov and Dadashev**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

276.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 268 of this Complaint as if fully set forth at length herein.

277.   Reliable CPM is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

278.   Solomonov and Dadashev knowingly conducted and/or participated, directly or indirectly, in the conduct of Reliable CPM's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over four years seeking payments that Reliable CPM was not eligible to receive under the New York No-Fault Laws because: (i) Reliable CPM submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Reliable CPM submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined protocols designed solely to financially enrich the Defendants; (iii) Reliable CPM submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds without lawful prescriptions issued by healthcare providers who are licensed to issue such prescriptions; and (iv) to the extent that Reliable CPM actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Fraudulent Equipment. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

279.   Reliable CPM's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Solomonov and Dadashev operate Reliable CPM, insofar as Reliable CPM is

not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Reliable CPM to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Solomonov and Dadashev continue to submit and attempt collection on the fraudulent billing submitted by Reliable CPM to the present day.

280.    Reliable CPM is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Reliable CPM in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

281.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $290,000.00 pursuant to the fraudulent bills submitted through Reliable CPM.

282.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Solomonov, Dadashev, Diwan, Rispoli, Sharma, and Capiola**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

283.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 268 of this Complaint as if fully set forth at length herein.

284.    Reliable CPM is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

285.    Solomonov, Dadashev, Diwan, Rispoli, Sharma, Capiola, and John Doe Defendants 1-10 are owners of, employed by, or associated with the Reliable CPM enterprise.

286.    Solomonov, Dadashev, Diwan, Rispoli, Sharma, Capiola, and John Doe Defendants 1-10 knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Reliable CPM's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for approximately six years seeking payments that Reliable CPM was not eligible to receive under the New York No-Fault Laws because: (i) Reliable CPM submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Reliable CPM submitted bills to GEICO for Fraudulent Equipment that it purportedly provided to Insureds based – not upon medical necessity but – upon predetermined protocols designed solely to financially enrich the Defendants; (iii) Reliable CPM submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds without lawful prescriptions issued by healthcare providers who are licensed to issue such prescriptions; and (iv) to the extent that Reliable CPM actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Fraudulent Equipment. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".  Each such mailing was made in furtherance of the mail fraud scheme.

287.    Solomonov, Dadashev, Diwan, Rispoli, Sharma, Capiola, and John Doe Defendants 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to

defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

288.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $290,000.00 pursuant to the fraudulent bills submitted through Reliable CPM.

289.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Reliable CPM, Solomonov, and Dadashev**
**(Common Law Fraud)**

290.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 268 of this Complaint as if fully set forth at length herein.

291.    Reliable CPM and Solomonov and Dadashev intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

292.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements and not based upon medical necessity, which were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon

medical necessity; (iii) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the Fraudulent Equipment was issued based upon lawful prescriptions when the Fraudulent Equipment was provided without lawful prescriptions; and (iv) in every claim, to the extent that any Fraudulent Equipment was actually provided, the charges for Fraudulent Equipment contained in the bills to GEICO misrepresented that they were less than or equal to the maximum permissible reimbursement amount.

293.    Reliable CPM and Solomonov and Dadashev intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Reliable CPM that were not compensable under the No-Fault Laws.

294.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $290,000.00 pursuant to the fraudulent bills submitted by the Supplier Defendants through Reliable CPM.

295.    The Supplier Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

296.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Reliable CPM, Solomonov, and Dadashev
### (Unjust Enrichment)

297.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 268 of this Complaint as if fully set forth at length herein.

298.    As set forth above, the Supplier Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

299.    When GEICO paid the bills and charges submitted by or on behalf of Reliable CPM for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Supplier Defendants' improper, unlawful, and/or unjust acts.

300.    The Supplier Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Supplier Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

301.    The Supplier Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

302.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $290,000.00.

## SIXTH CAUSE OF ACTION
### Against Diwan, Rispoli, Sharma, Capiola, and John Doe Defendants 1-10
### (Aiding and Abetting Fraud)

303.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 268 of this Complaint as if fully set forth at length herein.

304.    Diwan, Rispoli, Sharma, Capiola, and John Doe Defendants 1-10 knowingly aided and abetted the fraudulent scheme perpetrated against GEICO by the Supplier Defendants.

305.    The acts taken by Diwan, Rispoli, Sharma, Capiola, and John Doe Defendants 1-10 in furtherance of the fraudulent scheme include knowingly: (i) providing prescriptions for Fraudulent Equipment that were billed to GEICO by the Supplier Defendants as a result of unlawful financial arrangements; (ii) providing prescriptions for Fraudulent Equipment that were billed to GEICO by the Supplier Defendants pursuant to predetermined fraudulent protocols and

without regard for medical necessity; (iii) providing prescriptions for Fraudulent Equipment that were unlawful so as to allow the Supplier Defendants to unlawfully provide Fraudulent Equipment to Insureds and subsequently bill GEICO; and (iv) participating in each of the foregoing acts with knowledge that the prescriptions would be used by the Supplier Defendants to support their fraudulent claims.

306.   The conduct of Diwan, Rispoli, Sharma, Capiola, and John Doe Defendants 1-10, as more fully described above, were in furtherance of the fraudulent scheme and were significant and material.

307.   The conduct of Diwan, Rispoli, Sharma, Capiola, and John Doe Defendants 1-10, as more fully described above, were a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for the Supplier Defendants to bill GEICO for Fraudulent Equipment.

308.   Diwan, Rispoli, Sharma, Capiola, and John Doe Defendants 1-10 each aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges for Fraudulent Equipment that were not compensable under the No-Fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

309.   The conduct of Diwan, Rispoli, Sharma, Capiola, and John Doe Defendants 1-10 caused GEICO to pay money based upon the fraudulent charges submitted to it through Reliable CPM in an amount to be determined at trial, but in no event less than $290,000.00.

310.   The extensive fraudulent conduct of Diwan, Rispoli, Sharma, Capiola, and John Doe Defendants 1-10 demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

311.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

312.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Reliable CPM, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Reliable CPM has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against Solomonov and Dadashev, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $290,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Solomonov, Dadashev, Diwan, Rispoli, Capiola, Sharma, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $290,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Reliable CPM, Solomonov, and Dadashev, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $290,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Reliable CPM, Solomonov, and Dadashev, more than $290,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

F.      On the Sixth Cause of Action against Diwan, Rispoli, Capiola, Sharma, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $290,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: November 11, 2020
       Uniondale, New York

RIVKIN RADLER LLP

By:_____/s/ Barry I. Levy_____
       Barry I. Levy (BL 2190)
       Michael A. Sirignano (MS 5263)
       Michael Vanunu (MV 4167)
       Joanna B. Sobel (JS 0519)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*